In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-2260

CARMINE GREENE, *et al.*,

*Plaintiffs-Appellants*,

*v.*

WESTFIELD INSURANCE COMPANY,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:09-cv-510 — **Philip P. Simon**, *Judge*.

ARGUED JANUARY 8, 2020 — DECIDED JUNE 25, 2020

Before FLAUM, ROVNER, and SCUDDER, *Circuit Judges*.

SCUDDER, *Circuit Judge*. This appeal represents the culmination of more than ten years of litigation between a group of neighbors in Elkhart, Indiana and a nearby wood recycling facility. The neighbors alleged that VIM Recycling's waste disposal practices exposed them to dust and odors in violation of federal environmental law. They also brought state tort law claims for the resulting loss of use and enjoyment of their property and adverse health effects. At certain points the

defendants—VIM Recycling, a related entity, and their owner, Kenneth Will—successfully fended off the neighbors' claims. But sometimes they did nothing at all. These litigation choices eventually led to a $50.56 million default judgment against VIM.

What began as a case about environmental pollution has evolved into a joint garnishment action against VIM's insurer, Westfield Insurance, to satisfy some of that $50.56 million judgment. Now that the neighbors share their litigation interests with VIM—both want Westfield to pay the judgment—they had to adjust some of their positions to argue that VIM's Westfield policies apply. The neighbors labor to distance themselves from certain facts they previously pleaded were true to show that VIM did not know the extent of the pollution at the time its Westfield insurance policy went into effect. This task proves too difficult. Because two exceptions in the insurance agreement apply, we affirm summary judgment for Westfield Insurance.

# I

## A

VIM began operating its Elkhart wood recycling facility around 2000. Problems allegedly began in the nearby residential community soon thereafter. By 2009 a group of neighbors banded together to bring a class action lawsuit to recover for damage to their property.

The plaintiffs are a certified class of 1,025 neighbors defined as all persons who owned or resided on property within certain boundaries between October 2003 and April 2013. In their complaint, the neighbors described VIM's Elkhart site as littered with massive, unbounded outdoor waste piles. They

also alleged that the company processed old, dry wood outside without the proper emissions, all of which violated the Fugitive Dust Control Plan that the Indiana Department of Environmental Management, or IDEM, imposed on the site in July 2000.

The neighbors claimed that VIM's disposal practices harmed the surrounding environment and their health. Without any containment system, waste piles emitted harmful smoke, dust, and odors and resulted in pollution seeping into the ground. The waste was also an eyesore, attracted mosquitos, termites, and rodents, and posed a fire hazard to the neighbors' properties. VIM's grinding of wood materials further emitted dust and other pollution, which collected on homes and cars. Many neighbors also alleged that the exposure to wood dust caused health problems, including "severe headaches, eye, nose and throat irritation, chronic bronchitis, unexplained skin rashes, nose bleeds, difficulty breathing, asthma-like and other respiratory symptoms." They claimed that over the years they had "attended public hearings and meetings, signed petitions, and submitted oral and written complaints" to numerous state and federal agencies, the media, and VIM itself before finally resorting to federal court in 2009.

While some of this was taking place, VIM had acquired general commercial liability policies with Westfield Insurance. These policies collectively ran from January 1, 2004 through January 1, 2008, and obligated Westfield to pay up to $2 million of any judgments against VIM for "property damage" or "bodily injury." Each policy contained a section entitled "Duties in the Event of Occurrence, Offense, Claim Or Suit," which required VIM "as soon as practicable" to notify

Westfield of any occurrence or offense that "may result in" a claim. Upon the filing of a claim, the policies uniformly required that VIM "must see to it that [Westfield] receive[d] written notice of the claim or 'suit.'" This notice would then allow Westfield to either take over defending the lawsuit or seek to contest coverage through other proceedings.

B

Beyond this background, the litigation history is important. It involves three separate lawsuits over the course of 10 years. Bear with us.

*First Lawsuit*. On October 27, 2009, the neighbors filed their original complaint in the Northern District of Indiana against three related VIM defendants—VIM Recycling LLC (which operated the facility), K.C. Industries LLC (which owned the property), and Kenneth Will (who was the president and owner of both). The complaint detailed the neighbors' alleged harm to their property and health stemming from the facility's disposal practices. The neighbors sued for violations of the federal Resource Conservation and Recovery Act. They also brought supplemental claims for nuisance, trespass, and negligence under Indiana law and sought injunctive relief, damages for their tort claims, and attorneys' fees available under RCRA.

On April 21, 2010, the district court dismissed the complaint because of statutory limitations under RCRA and declined to exercise supplemental jurisdiction over the state law claims. At the time of the court's dismissal, Westfield Insurance had no knowledge of (or involvement in) the litigation. The reason was because VIM never notified Westfield that it had been sued in federal court for events that took place

within the policy coverage periods. VIM instead took it upon itself to hire a law firm to defend against the neighbors' lawsuit. And when the district court dismissed the neighbors' complaint, VIM never informed Westfield of the development. Put most simply, Westfield never knew about its potential liability exposure.

But the story does not end there. The neighbors appealed, and we reversed the district court's dismissal order, holding that the complaint did state a claim under RCRA and there was federal jurisdiction. See *Adkins v. VIM Recycling*, 644 F.3d 483 (7th Cir. 2011). We remanded for further proceedings.

*Second Lawsuit.* In the meantime, VIM *did* seek coverage from Westfield in a different case. On May 24, 2010, the neighbors filed a second, nearly identical lawsuit against VIM in Indiana state court. Pending an investigation into its own coverage obligations, Westfield responded by hiring its own lawyer to serve as its assigned defense counsel for VIM in this state action. Despite all this interaction, neither VIM nor the neighbors informed Westfield about the existence of—let alone sought coverage for—the parallel federal action then pending in this court.

On October 14, 2010—two weeks after VIM gave notice of and a request of coverage for the state lawsuit—Westfield learned for the first time about the federal lawsuit. Mark Smith, the attorney Westfield had just hired to serve as its outside counsel in connection with the investigation into coverage for the state action, told a Westfield Litigation Specialist that the neighbors had sued VIM in federal court as well, and that the case had been dismissed but was on appeal in the Seventh Circuit. Westfield took no action upon learning this new information.

*Third Lawsuit*. Westfield meanwhile continued to evaluate its potential exposure in the case pending in state court. It concluded that it had no coverage obligations and sent a letter to VIM stating as much. It then sought a declaratory judgment in federal court against both VIM and the neighbors. VIM never answered the complaint, and the district court entered a default declaring that Westfield had no duty to defend or indemnify VIM in the state action. The court ordered that the neighbors enter into a stipulation with Westfield stating that Westfield had no duty to indemnify or defend in the state action because VIM did not provide timely notice of the lawsuit "or history of the environmental issues outlined therein."

Between 2010 and 2011 there were three cases in play—the original federal case (the case before us), the state case, and the federal declaratory judgment case relating to the state case. Westfield Insurance successfully disclaimed any obligation in Indiana state court through the federal declaratory judgment action but did not concern itself with this case, which it had only heard about indirectly from its own lawyer when it had been dismissed.

While VIM's lawyers were initially successful in winning dismissal of the neighbors' claims without Westfield's involvement, things quickly began to unravel on remand in the district court. VIM's counsel withdrew from the case and the company never retained new counsel. And VIM still did not notify Westfield of this lawsuit for which it now seeks coverage. VIM's failure to defend itself in the litigation had adverse consequences for the company—the district court adopted all of the neighbors' facts. It calculated the damages for the neighbors' nuisance claim, which included "the loss of use and enjoyment of their properties and the personal

discomfort and inconvenience caused by VIM Defendants' operations from October 28, 2003 to July 25, 2011." The court noted that class members felt trapped in their own homes, "not being able to have cookouts, work in the garden, talk to their neighbors, or engage in any of the other types of outdoor activities." Many left the neighborhood altogether for weeks at a time because of the conditions. All of this led to the court entering a default judgment of $50.56 million, plus $273,000 in litigation costs, against VIM.

So we come to the issue before us today. After securing the default judgment but realizing they were unable to recover much from VIM, the neighbors moved to institute proceedings against Westfield under Federal Rule of Civil Procedure 69, which allows the court to "garnish," or recover, a money judgment that one party owes another. See *Yang v. City of Chicago*, 137 F.3d 522, 526 (7th Cir. 1998) ("[A] Rule 69 garnishment proceeding to collect a judgment from a third person not party to the original suit is within a court's ancillary jurisdiction, providing the additional proceeding does not inject so many new issues that it is functionally a separate case." (internal quotation marks omitted)). The neighbors invoked the rule and sought to garnish Westfield's indemnity obligation to VIM pursuant to its insurance policies to satisfy part of the $50.56 million award.

As a threshold matter, the district court declined Westfield's invitation to apply the doctrine of *res judicata* to the order entered in the declaratory judgment action, which stated that the Westfield policies did not apply to the neighbors' damages. The district court charted that course because it viewed the declaratory judgment action as relating only to the

Indiana state case and therefore having no preclusive effect in the ongoing federal court litigation.

From there the district court still proceeded to enter summary judgment for Westfield. The court concluded that Westfield owed no insurance coverage because the policy excluded damages for expected or intended injuries, the neighbors' damages were claims known to VIM at the time it purchased the policies, and VIM breached the policies' notice requirement.

The neighbors and VIM—now both plaintiffs in this action against Westfield—appealed.

## II

We first address the two relevant exclusions in VIM's general commercial liability policies with Westfield. The policies generally applied to any damages VIM was legally obligated to pay because of "bodily injury" or "property damage" that took place within the coverage period. If an exclusion applies, however, Westfield had no obligation to VIM, and the neighbors cannot seek to recover any of their judgment from Westfield.

Each of the four policies in place during the relevant period contained an exclusion for "known claims." This type of exclusion gives effect to the common law principle "that one may not obtain coverage for a loss that has already taken place." *Ind. Ins. Co. v. Kopetsky*, 14 N.E. 3d 850, 852 (Ind. Ct. App. 2014). The alternative would defeat a basic purpose of acquiring insurance in the first instance—to cover future, not past, losses. See 1 COUCH ON INSURANCE § 1:7 (3d ed. 2020).

VIM's policies with Westfield specifically stated that they did not cover losses if "a listed insured or authorized

employee knew prior to the policy period, that the bodily injury or property damage occurred" and that "any continuation, change or resumption" of the property damage or bodily injuries "during or after the policy period will be deemed to have been known prior to the policy period." This forward-looking aspect of the known claims exclusion is closely related to a second and separate exclusion Westfield invokes as part of disclaiming any coverage. This second exclusion provides that coverage does not extend to any bodily injury or property damage "expected or intended from the standpoint of [VIM]."

We interpret the "known claim" and "expected or intended injury" exclusions based on their plain language. See *Motorists Mut. Ins. Co. v. Wroblewski*, 898 N.E.2d 1272, 1275 (Ind. Ct. App. 2009) ("If the language is clear and unambiguous, we give the language its plain and ordinary meaning."). Though they are distinct, we can evaluate the two exclusions together, as the language of both focuses on when VIM first learned about the property damage and bodily injuries that gave rise to the neighbors' lawsuit in 2009.

The extent of Westfield's obligations can be easily resolved (as nonexistent) if VIM—specifically, VIM's owner Kenneth Will—knew about the neighbors' injuries before the first policy went into effect on January 1, 2004. If he did, any similar injuries that took place in the next four years would amount to the revival of a known claim and that exclusion would apply. It also stands to reason that Will would reasonably have expected those later injuries given that the VIM recycling facility continued with the same disposal conduct for years after this notice, so the expected or intended injury exclusion would therefore apply as well. See *Auto-Owners Ins. Co. v.*

*Harvey*, 842 N.E.2d 1279, 1288 (Ind. 2006) (noting that Indiana law requires courts to consider "whether the resulting injury or damage was intentional or reasonably expected by the insured" (emphasis omitted)); see also *PSI Energy, Inc. v. Home Ins. Co.*, 801 N.E.2d 705, 728 (Ind. Ct. App. 2004) ("Expected injury means injury that occurred when the insured acted even though he was consciously aware that harm was practically certain to occur from his actions.").

Evaluating Will's knowledge is straightforward. Both the complaint and the undisputed facts at summary judgment supply many examples. Recall that, as part of entering a default judgment against VIM, the district court properly deemed and accepted as true all allegations advanced by the neighbors in their second amended complaint. See *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983). And at summary judgment, Westfield submitted numerous IDEM letters and inspection reports that were sent to Will before 2004. The Indiana Department of Environmental Management's July 2000 Fugitive Dust Control Plan for VIM—a plan designed to ensure that dust from wood recycling did not leave VIM's property—was only one of many interactions between VIM and that department.

Putting all of this evidence together, the record at summary judgment included at least the following facts:

- A September 29, 2000 IDEM inspection prompted by neighbor dust complaints found that VIM's grinding operations created visible dust and violated both the Indiana Administrative Code and its own Fugitive Dust Control Plan. An IDEM inspector spoke with Will about his findings on the same

- day, and a report was sent to Will by certified mail a month later.

- On July 14, 2001, Will signed an agreed order with IDEM reiterating the September 2000 findings and acknowledging other violations and days that fugitive dust went beyond VIM's property line.

- In August 2003, an IDEM inspector observed several violations of the Fugitive Dust Control Plan, VIM's operating permit, and Indiana environmental rules. The inspector documented these violations in an enforcement letter sent to Will in October 2003.

- Several neighbors made complaints about fugitive dust—some of which settled onto their cars—to IDEM in 2003. VIM paid to have some of the cars washed.

- Around the same time in 2003, the *Elkhart Truth* newspaper published two op-eds about the fugitive dust problem at VIM.

- In an April 21, 2004 phone call with IDEM, Will acknowledged that he "had met with the neighbors on occasion to discuss fugitive dust concerns."

- In all, IDEM issued five Notice of Legal Action or Notice of Violation/Potential Violation letters to VIM prior to January 1, 2004.

Considered collectively, the record supplies overwhelming evidence that VIM—and Kenneth Will in particular— knew about the fugitive dust and resulting injuries before the

first Westfield policy went into effect. Any damages for those injuries, then, were both known claims and expected injuries.

The arguments the neighbors previously advanced in the case also support this conclusion. Their argument on appeal—that VIM did not know about or expect these claims—constitutes an abrupt change of course. Remember this whole controversy started with the suit for property damage over the course of many years. In 2015, when the district court had just entered default against VIM, the neighbors suggested that the court calculate their damages for a period that began on October 28, 2003. That is two months before VIM's first Westfield policy went into effect on January 1, 2004 and supports the proposition that the property damage was a known claim or expected injury by that date.

There is more. In their second amended complaint—again, all of which has been accepted as true—the neighbors alleged that they notified VIM about the problems "[o]n countless occasions" but VIM "callously continue[d] their harmful activities and turn[ed] a deaf ear and blind eye to the neighbors' complaints." The neighbors thus cannot credibly claim that the VIM defendants were unaware of these injuries before January 1, 2004 or that they would not reasonably have expected them to continue through 2008. For this reason, both the known claim and expected or intended injury exclusions apply, and Westfield is not obligated to cover the neighbors' judgment.

### III

The neighbors and VIM urge several different reasons to avoid the effect of the policy exclusions. None are persuasive.

A

They first do so by arguing that the district court based the default judgment award on injuries that did not rise to the level of "bodily injury" or "property damage" as defined in the insurance policies and therefore do not fall within either exclusion—which apply only to these kinds of harm. Falling outside these definitions, the neighbors and VIM continue, means that the policy exclusions cannot operate to preclude garnishment. We do not buy the contention.

We again begin with the plain language of the insurance policies. See *Buckeye State Mut. Ins. Co. v. Carfield*, 914 N.E.2d 315, 318 (Ind. Ct. App. 2009). The policies define "property damage" as both "[p]hysical injury to tangible property" and "[l]oss of use of tangible property that is not physically injured." The policies also provide that "bodily injury means bodily injury, sickness or disease sustained by a person." The neighbors' tort damages that formed the basis for the default judgment accounted for their loss of use of their properties, as they were at times either forced indoors or driven out of the area entirely. The fact that they were deprived of their outdoor spaces plainly meets the policies' definition of "property damage" as "[l]oss of use of tangible property."

What is more, the argument that the neighbors' injuries are not "property damage" is self-defeating. VIM's relevant Westfield policies covered only damages for "bodily injury" or "property damage." If the neighbors' award is not based on "bodily injury" or "property damage," then it is not covered by the policies at all and Westfield does not owe indemnity in the first place. If, on the other hand, the dust did cause "bodily injury" or "property damage," it is clear that VIM was

aware of those same issues before 2004 and the exclusions apply. The neighbors cannot have it both ways.

B

The neighbors also point to an affidavit from Kenneth Will, prepared in 2018 for these supplemental garnishment proceedings, to create a factual issue. In the affidavit, Will states that "[a]t no time prior to January 1, 2007"—the date the final year-long policy went into effect—"was [he] aware that 'bodily injury' or 'property damage' within the meaning of the Westfield Policies … had occurred in whole or in part as the result of the operations or other conduct of VIM or K.C. or conditions at the Site."

The district court held that Will's representations failed to create a factual issue for the purposes of summary judgment. While we review summary judgment decisions *de novo*, a district court's decision to set aside an affidavit submitted on summary judgment to create an issue of fact is assessed only for abuse of discretion. See *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

We consider only the obvious meaning of Will's statement that while he may have known about the fugitive dust and neighbors' complaints, he was unaware that the damage constituted "bodily injury" or "property damage" as defined in the Westfield policies. This reading is most consistent with the plain meaning of his statement as he mentions "within the meaning of the Westfield Policies" and puts the exclusions themselves in quotes, indicating them as defined terms in the policies. It is also the only plausible conclusion in light of the existing record. But affidavits are for stating facts, not legal conclusions. See FED. R. CIV. P. 56(c)(4) (specifying that

affidavits must "set out facts that would be admissible in evidence"); see also *Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985) (noting that "legal argument in an affidavit may be disregarded").

It is possible that Will did not know the neighbors' complaints prior to January 1, 2007 met these policy definitions. As the district court noted, however, that is not what matters for the purpose of the expected or intended injury exclusion. The pertinent inquiry concentrates more on known facts. We are concerned with only whether Will knew that VIM was engaging in activities that would cause some form of harm to the neighbors' property. See *FLM, LLC v. Cincinnati Ins. Co.*, 27 N.E.3d 1141, 1143 (Ind. Ct. App. 2015) (noting that the question whether an injury was expected ensures that it was not accidental); *Ind. Farmers Mut. Ins. Co. v. Graham*, 537 N.E.2d 510, 512 (Ind. Ct. App. 1989) ("Expected injury or damage means that the insured acted although he was consciously aware that the harm caused by his actions was practically certain to occur.").

Will was certainly aware of these underlying facts before the policies went into effect. He knew that the neighbors were complaining to IDEM between 2000 and 2003. Indeed, he admits in his affidavit that he paid to have their cars washed. He also cannot deny that he received several letters from IDEM documenting violations and fielded neighbor complaints around the same time. All of this occurred before 2004. Put another way, by January 1, 2004, Will knew of and routinely acknowledged the dust problems. The overwhelming weight of evidence here—the facts the neighbors themselves relied on when they won their default judgment in 2015—supports the district court's conclusion that VIM was "consciously

aware that the kind of environmental harms alleged in the Class's complaint, and on which the default judgment is based, were practically certain to result from their operation of the Elkhart facility over the period of coverage." Summary judgment was appropriate because there is no genuine dispute of material fact.

Try as they might, the neighbors cannot construe the language of the operative policy exclusions to support a view at odds with the position they pressed for years in pursuing claims against VIM. The exclusions apply and Westfield has no obligation to pay any portion of the $50.56 million default judgment the neighbors secured before bringing the insurer into the litigation.

C

Finally, the neighbors and VIM argue that Westfield is estopped from invoking any policy exclusions because it breached its duty to defend. It is true that if Westfield received adequate notice of the lawsuit, it likely had a duty to defend VIM, as "[t]ypically, an insurer has a duty to defend its insured against suits alleging facts that might fall within the coverage." *Fed. Ins. Co. v. Stroh Brewing Co.*, 127 F.3d 563, 566 (7th Cir. 1997). The duty to defend is broader than the duty to indemnify, meaning that it might apply even if the policy is ultimately found not to cover the insured's conduct. See *Ind. Farmers Mut. Ins. Co. v. N. Vernon Drop Forge, Inc.*, 917 N.E.2d 1258, 1267 (Ind. Ct. App. 2009).

Under Indiana law, insurance exclusions act as affirmative defenses and the insurer has the burden of proving their applicability. See *Keckler v. Meridian Sec. Ins. Co.*, 967 N.E.2d 18, 23 (Ind. Ct. App. 2012). And like other affirmative defenses,

they may be waived in certain circumstances. The neighbors and VIM argue that if Westfield breached its duty to defend, it is now estopped from raising the known claim and expected or intended injury exclusions, as "[a]n insurer, having knowledge its insured has been sued, may not close its eyes to the underlying litigation, force the insured to face the risk of that litigation without the benefit of knowing whether the insurer intends to defend or to deny coverage, and then raise policy defenses for the first time after judgment has been entered against the insured." *Liberty Mut. Ins. Co. v. Metzler*, 586 N.E.2d 897, 902 (Ind. Ct. App. 1992). An insurer that has received notice of a lawsuit and believes it has no duty to defend should act as Westfield did in VIM's state case—it should either file a declaratory judgment action or hire counsel to defend its insured under a reservation of rights. See *id*. Not doing so is risky and done at the insurer's "own peril." *Id*. at 901.

The question whether Westfield received notice that might have triggered its duty to defend is complicated because Indiana law is murky on the issue of indirect notice in these circumstances. Recall that Westfield only found out about this case from its own lawyer in October 2010, while the case was on appeal in this court. VIM plainly violated its obligation under the policies to provide written notice of the suit "as soon as practicable."

But VIM's policy violation does not end the inquiry. Although Indiana law recognizes that notice requirements are "material, and of the essence of the [insurance] contract," *Miller v. Dilts*, 463 N.E.2d 257, 263 (Ind. 1984), an insurance company can disclaim coverage only if it was prejudiced by the lack of notice. See *Tri-Etch, Inc. v. Cincinnati Ins. Co.*, 909 N.E.2d 997, 1004 (Ind. 2009). And while the neighbors and

VIM recognize that late notice "creates a rebuttable presumption of prejudice in favor of the insurer," they argue that Westfield had not been prejudiced when it received its indirect notice. *Id*. They contend that Westfield's duty to defend remained intact because everything that had happened up until October 2010 in the federal court litigation was positive for Westfield, as the case had been dismissed.

We note that the prejudice inquiry is only debatable if the indirect notice triggered Westfield's duty to defend. If the indirect notice was inadequate, however, Westfield was properly notified only by the filing of supplemental proceedings and was certainly prejudiced at that point by the $50.56 million default judgment. VIM's failure to notify Westfield would be a material violation of the policies, and Westfield would owe no indemnity.

The district court held that inadequate notice was yet another reason to grant summary judgment for Westfield. But given our conclusion about the known claim and expected or intended injury exclusions, it is unnecessary for us to wade into this area of Indiana insurance law addressing indirect notice and prejudice. Indeed, we decline to do so.

Even if the indirect notice triggered Westfield's duty to defend VIM, Westfield would not be equitably estopped from raising its policy defenses. True enough—in some cases Indiana courts have held that an insurer may be so estopped after failing to defend its insured. See, *e.g.*, *Ind. Ins. Co. v. Ivetich*, 445 N.E.2d 110, 112 (Ind. Ct. App. 1983); *Am. Family Mut. Ins. Co. v. Kivela*, 408 N.E.2d 805, 811 (Ind. Ct. App. 1980). But those cases were concerned with abandonment after direct notice and held "leaving the insured to fend for itself[] bars the

insurer from recourse to its exclusions." *Stroh Brewing Co.*, 127 F.3d at 571.

We confront very different circumstances here. The record does not support a conclusion that Westfield has acted in bad faith by flatly refusing VIM coverage in this federal case. Its actions in the state case indicate that—had VIM tendered proper notice—Westfield would likely have taken steps to investigate and the neighbors may have faced a defense in the underlying case. Our consideration is equitable and Westfield in no way avoided or breached its duty to defend by leaving its insured out in the cold. At best it had only indirect notice of the lawsuit and no indication that VIM or the neighbors—who were both in possession of the facts essential to provide direct notice—would ever seek coverage. Westfield shirked no responsibilities in the face of VIM's and the neighbors' belated, opportunistic pursuit of policy coverage. In the totality of the facts and circumstances, we cannot conclude that principles of equity have a role to play. Even if the indirect notice triggered any duty to defend, Westfield would not be estopped from claiming its applicable policy exclusions.

For these reasons, we AFFIRM.